May it please the Court, my name is Walter Dirks. I am counsel for Minority Broadcasting Project. I'd like to reserve five minutes, if I may. Whatever's left on the clock will be all yours. Thank you, Your Honor. This case has been well-briefed, so I would like to limit myself to just a few key points that I think will be important for the Court to consider in its consideration of this case. Again, this case involves a statute which prohibits three categories of underwriting announcements on public broadcast stations while permitting all other underwriting announcements. On its face, it does not permit an underwriting announcement for a for-profit organization promoting its goods and services. It doesn't permit issue advertising or underwriting. It doesn't permit political underwriting announcements. It does permit a lot of other commercial speech. It permits image advertising. Well, let's say we were to agree with you that that is what it does and it's impermissible. I'm not saying we would, but let me start at the back end. So what is the consequence of that? What would happen then? Well, first of all, the consequence of – I'm not sure I understood your question. Let's say we were to agree with you that this is unconstitutional, impermissible – it's an impermissible statute. Let's say we get there. Okay. At that point – And that's what happens then. At that point, noncommercial broadcasters would have the ability, but not the obligation, to – How do you get there? Well, because – If it's an unconstitutional statute, why wouldn't we just strike it down? Right. And that means no one gets to advertise. Well, I think that the way it's written, 399B is written in terms of the things that are prohibited. Okay. It says you can't do – you can't – you cannot have it under – The standard score, aren't they, was there was no – there was no advertising at all. Why wouldn't we just – if we think that the distinctions drawn by the statute are unconstitutional, why wouldn't we just strike down the statute and go back to the day when there was no advertising permitted? Everybody gets treated equally badly, and therefore nobody has a cause for complaint. Why isn't that the appropriate remedy? Well, because I think that the – you have A and B. B says you can't – you can't have an underlying announcement that has an advertisement. And we're saying it's the distinctions, the things that the categories, the way it's set up, that the restrictions are unconstitutional. I think you strike A. No, what you're saying is the distinctions are unconstitutional. They treat some people better than other people. Correct. And constitutionally, we say, okay, we'll treat everybody just equally badly. Bam. We strike it down, which is the latest thing that Congress passed. It used to be that nobody could advertise. They then let some people in, some people didn't. Why don't we say letting some people in is not good enough? We strike it down. We go back to no advertising. Why doesn't that solve the problem? I mean, that would solve your problem, wouldn't it? That would – all the arguments you have would go away if we did that. All my arguments would go away. However, I don't think that would be – It wouldn't help your clients. It wouldn't help your clients, but it would help the law, the Constitution. You would have the satisfaction of knowing you helped right or wrong. You have a constitutional regime, you're saying. The – I think that when – You're not arguing that that regime would be unconstitutional, right? No, we would not argue that that regime would be unconstitutional. I don't think that would be consistent with the intent of Congress. Well, if you want to do what the intent of Congress, we'd uphold the statute. So we're already messing with the intent of Congress. The question is what is the appropriate degree to do that? Well, I think you've got two possible remedies. One is you could strike the restrictions, which is what we're urging you to do. The other is you could strike the whole thing. Those are obviously your two options. And why isn't striking down the whole thing the appropriate remedy if we were to agree with you that that is a constitutional problem? Well, I think that would do more violence to the scheme than what we're urging you to do. Well, so you want to strike two and three, not one. Well, we would urge you to strike all three of them because we don't think any one of them passes constitutional muster for a variety of reasons. All right, but if that doesn't work, just speaking hypothetically, would you rather keep one and then strike two and three? Well, obviously, we would prefer all three be stricken, but if that weren't the case, two and three. But two and three, I would suggest to you, is an even greater problem because of the legal and voters' observation that the hierarchy of speech has sort of been inverted here, because, you know, you have issue speech and political speech, which are in the highest rung of the Constitution, are being prohibited. So I can advertise Girl Scout cookies, but I can't talk about Save the Whales. But can you please tell me who's – with regard to the political speech and the public issue speech, whose First Amendment rights are we talking about here? I think we're talking about the First Amendment rights of the people who want to put the underwriting announcements on. Is there anything in the record showing there is any such person who wants to put such an ad on minority TV? Actually, the complaint, the complaint. It says that you would like to show such ads. Does it show that anybody – anybody in particular ever came to you and said I'd like to show such an ad? Well, actually, there was a deposition of the station manager where he talked about that. And what did he say? He said that he turned people down, that people wanted to do it. Did he say who? Did he say when? He gave some examples of people he had turned down. So are you asserting your First Amendment rights or the rights of the advertisers? What standing do you have to assert the First Amendment rights of the advertisers? I think generally speaking in the First Amendment context, I represent billboard companies, okay, so we get that – we get this issue all the time. We are permitted to assert the First Amendment rights, particularly in the area of nonpolitical – of noncommercial speech. In addition, a medium of communication, this is a Pittsburgh Press case that goes back to sometime in the late 70s, I believe, where the Supreme Court recognized that the advertising medium generally had a right to pick and choose which advertisers it wanted to take. But you're asserting your client's First Amendment rights. I think we're doing that, too, but I think we also have the – we also have standing to assert the rights of the people who would speak. Before I leave you on this one, you were making a First Amendment claim, not an equal protection claim. Am I correct? I think that's primarily correct, but I think that some of the cases when you read them, it's kind of hard to figure out exactly what you're talking about. I know what the cases say, but as I read your complaint, you assert only a First Amendment claim. I think that's primarily – that's correct. That's primarily what we're asserting here is that. And I think that, you know, when you take a look at it – What's that? I'm sorry? You're asserting that. What's that? Well, that the claims in the complaint are primarily, you know, premised on the First Amendment. Mm-hmm. The – Primarily or entirely? I'm sorry? Primarily or entirely? I mean, if you can point me to some place in this record where you've asserted an equal protection claim, I'd like to see it. I offhand couldn't tell you anything. So I think that's fair to say that, you know, this is posited on the First Amendment. I have another question. You had – you said that your understanding of the provision about the commercial advertising was that it went to any – only to profit-making organizations. Correct. Where does it say that? It says it's intended to promote any service, facility, or product offered by any person who is engaged in such offering for profit. For profit. Would that not include a sale of something by a non-profit organization if they're – whether or not the organization is a profit-making organization or not, if they're trying to make money on the thing they're offering? That's not the position the Federal Communications Commission has taken. In the record – That's what the statute says, though. It seems very carefully worded not to turn on whether it's a profit-making or non-profit organization. I don't think that anybody has ever taken the position that it applied to a non-profit who is offering whatever non-profits are offering in the way of products and services. For example, the only – there is an opinion letter or advisory letter from the FCC in the record involving an inquiry from a broadcast station somewhere in the Midwest about whether it was okay for them to take a underwriting announcement that promoted the services of Planned Parenthood, which is a non-profit. Yes, but that particular ad, if you read it, is precisely what's on NPR, at least, on every day about for profit-making organizations and non-profit organizations. It's not really an ad. Well, it really is. And I think that that is one of the other issues having to do with vagueness. Okay? But I think that when you – if you read the letter from the FCC, they have – they approached it the way that everybody I'm aware of has approached the way the statute is written, as opposed to what maybe you might think it ought to – you know, it ought to be in a perfect world exactly the way it's written. And what they – what they analyzed was that because Planned Parenthood is not the profit. But what I'm asking is whether one could interpret – whether we could interpret the statute such as – such that the non-profit category deals with what my understanding is was mainly meant to deal with, which is fundraising, contributions, soliciting of contributions by non-profit, and offering of free non-cost services, but not necessarily when they're selling something. Well, I'm – Wouldn't that avoid the constitutional problems we have? No, it wouldn't. Why not? It would – it would still have the problem of you are permitting what I call the image advertising. Okay? The Ford Motor Company puts on one of these gauzy underwriting announcements where, you know, basically they're saying we're wonderful human beings, you ought to think nicely of us. That is commercial speech. There's no getting away from it. It's commercial speech. And so what you still have the problem that the statute is inverting the hierarchy of the Constitution. And so what you're saying is that it's giving more protection to commercial speech than it is giving to non-commercial speech. That's what – that has been a problem going back to the 70s. It's giving less protection. How does it – could you explain that? Sure. Because I can read 1, 2, and 3, and I don't get where you derive that conclusion, so maybe you can fill me in. Okay. I'm the Ford Motor Company. I can – I can put on an ad on – when I'm asked to do an ad, it's called the I'm sorry? Do you have an example we can look at? Well, actually, I can – in the record, there are – actually, we quote some in our brief where – that were on the radio station, the public radio station in Washington, D.C., which we contended were, you know, show vagueness, but which the FCC says are on the right side of the line, promoting – you know, promoting companies in one way, shape, or form. What does it say? Where is it in your brief? I can give you some examples. Can I cut somewhere? Can we let it? You know, our position is that this shows how vague it is. Stop, stop, stop. I asked you to show me the text. Okay. I'm going to try to do that for you. It's hard to focus on what you're saying. On page 46 of our initial brief. The blue brief? Yes. That must be the blue brief, yes. We quote an ad for Hardwood Artisans, a really great company in Washington, D.C. For what? A fabulous company, a really high-end furniture company. Our classical music is made possible by your membership and card donation, and by Hardwood Artisans, creating original designs for over 30 years, from bookcases to murphy beds to rocking chairs. Hardwood Artisans handcrafted furniture to order in Northern Virginia. Simply beautiful furniture. That is not atypical of what runs. There's also, up further on the page, there's an underwriting announcement for the Tony Kornheiser show on Washington Post Radio. Underwrite an ad because they gave money to underwrite it? Correct. That's how it works. And how is that different from a commercial ad? I'm sorry, what? How is that different from a commercial ad? Well, that's our point. We don't think it is. We think it is a commercial ad. So you don't have a problem. No, we do have a problem. Our problem is that — I'm sorry. What is your problem? Why can't all of your advertisers use this as an underwriter ad? They have an underwriter. They send money in. If I am a — if I have an issue or I have a political thing, I can't do it. I cannot have an underwriting announcement. You say our classical music may parcel the day by your membership and a donation from Joe Snert, who is running for Congress in Maryland, or wherever your station is. Well, it would be — He — you know, he generously is a — you know, he's a great guy and a wonderful human being, honest, and has a day as long. And he made a nice contribution to the station, which makes this classical music possible. Why couldn't you do that? That would be political. Why? The same thing if you had a person who — I'm sorry. Why would that be not permissible, whereas this would be? Well, it supports or opposes a candidate. It's supporting a candidate. He's saying he's a wonderful guy in the example you gave. They wouldn't — you can't do it. You know, if you took the equivalent of the hardwood artisans thing, it would be talking about the positions that he had on issues. So you can't do it. I mean, I don't see how that's different than saying that hardwood artisans makes nice furniture. Well, our position is that actually this particular one I quoted you is an example of demonstrating the vagueness of the promotional by for-profit organizations prohibition, because of where is the line that we get into, and we even quote a law review article that's — But in fact, there hasn't been a whole lot of trouble in figuring out the lie. I mean, the fact is that your client was doing something very different. Your client was having ads in which people were speaking in their own voices and were doing so over the — they were longer, is my understanding, and they were promotional in a somewhat different sense. They were not in the voice of the announcer. They were — they were essentially handing that time over to the advertisers, as I understood it, to put on the same ad they would have put on a commercial station. Is that basically what happened here? Okay. That — that is what was involved earlier, but that is not what we're challenging here. This is entirely a facial case. We are not challenging anything to do with those ads. But you're suggesting that somehow you couldn't have known that those were ads, but you obviously did. Well, let's — let's just talk about what the FCC itself has said about vagueness. We want to talk about vagueness for a minute. In 1992, this is what the FCC said. This is 11 years after the statute was passed. It is — the FCC wrote in a public notice that it had become aware of significant uncertainty and controversy concerning various aspects of commission and statutory policy relating to commercial underwriting on noncommercial stations. This is 11 years after the statute was passed. The FCC is acknowledging significant uncertainty and controversy surrounding it. That doesn't strike me, if you listen to it, as a description of the statute dispute. Excuse me, but what you're complaining about is the format of the ads rather than the content. It could be — Well, I mean, you know, it's a different challenge to say, you know, you can have commercial ads, you know, you can have them as underwriting announcements, but you just want to have something that looks more like a Big Mac ad, right? Well, there are — there are two — there are two sort of separate piles of arguments here. One deals totally with the noncommercial prohibitions, okay? And we would — we would contend that under Legal Women Voters, that the — that the scrutiny with which you look at that is heightened. Do we have in the record anywhere an example of the kind of an ad that you wanted to show that was a political or issue ad? One. Do we have one? We don't, because this is — this is not an as-applied case. This is a facial challenge. But we're still entitled to have some idea of what we're talking about, and we don't seem to have any. I mean, it's not true that you've agreed that there can be — that the ads can be limited so they don't interrupt shows. Right? Correct. You're not challenging that. And you're challenging the spells. They said it could be 10 seconds, no more, which is about what they usually are. Could that — could that — could it be okay? Well, except — see, there's — those are things that really aren't required. The statute doesn't deal — one of our — one of our contentions with regard to this, and thank you for raising it, is that there are non-speech-related tools available to the government to — to regulate whatever is being said.  say that there is a rule that says that the word is perceived to be the issue. The Law Review article written by a former associate general counsel of the Public Privacy Association talks about — All right. Suppose that was the rule. Okay. No more than 10 seconds can interrupt a show. And not only that, it has to be in the voice of the announcer. It can't be in a third-party voice. Okay. That's all okay. Well, those are — those are time, place, and manner. That is not content-based. The problem we had is that we — Now, do we have any reason to think any issue person or candidate has ever wanted to put on such an ad? The — all we do know is what is in the deposition of my client, where he said he turned people down. He say who people? What they wanted to do? Who wanted to do political ads. He say who they were, what they wanted? He did. He did it to — at this point, I don't remember his — It's not in the record because he — this had — this went to the whole — Well, it's not in the record, then it's not in the record. Okay. It went to the whole standing part of this. And as soon as the government realized that my client wasn't, you know, just making it up, that in fact he had opportunities to take this advertising and was turning it down, the standing issue went away. No. But I think if there's a serious question about whether a particular endorsement or whatever we're going to call it is permissible, you can ask the FCC. Is that right? You can. But the problem with that is that sounds suspiciously like a prior restraint. There are no time limits. Well — There are no time limits, and you don't have the normal, you know, when the Supreme Court has looked about things that is labeled prior restraints. Let me ask it this way. Okay. It sounds as though the FCC has been in the business of saying yes or no in a fashion of giving guidelines, so guidance. Is that right? You can write them asking for guidance, but they're under no obligation to get back to you in a timely manner. But that's a different — that's a different issue. I mean, you're down the road to a regulatory challenge. That's right. We're not dealing with that right now. So let's go back to how it all started. First of all, there's no advertising. Then they undertake — the FCC undertakes an extensive study. There's notice, comment, public comment, et cetera. And then Congress moves in and passes a statute. So why hasn't — why isn't there sufficient record here for what Congress did? Because, as Judge Kaczynski said, maybe the answer is, okay, no advertising. That's where you started. Would that be constitutional in your view? It would be constitutional. You could argue that whether it's a wise government policy, but it would be constitutional. Okay. So that would be constitutional. Absolutely. So that's where we start. No advertising, constitutional, no problem. Now, after notice, comment, debate on the floor, Congress comes in and says, we've heard what you said, but we've reconsidered because we think there should be some exceptions from the flat-out ban. What's wrong with that? Well, a number of things. First of all, our contention is that they drew the line in unconstitutional ways. The other thing is a speech-related — Let's start there. Okay. Okay. They drew the line in an unconstitutional way. Correct. What's unconstitutional? They're favoring commercial speech over noncommercial speech. That's the first problem. That has been a problem all the way back to 1981 when Metronida — I think that you mean the opposite, don't you? They're favoring commercial over noncommercial. How? How? They're permitting certain commercial speech. Image advertising, promotion of goods and services by nonprofits. But that depends upon your answer to Judge Kaczynski, that I'm not sure is borne out based on the materials we have here in front of us. Judge Kaczynski asked, well, what's to prevent candidate Joe Blow from asking that his logo be presented in the same way that Exxon presents its logo? That would be — So, Judge Fletcher, you said it so much better than I did. Okay. It's supporting or opposing a candidate. You couldn't do the equivalent of the Hardwood Artisan ad that I just read to you, because that clearly would be promoting a candidate for public office. Say you, but why? Well, if you listen to the statute — Did it drive? The statute says support or oppose a candidate. If I say — In the statute, it looks to me like the Hardwood Artisan's ad wouldn't fly either. But you say it does, so now I'm confused. It is still content-based. Is it? Yes. What if the ad were, let's take the governor of California. This program is brought to you by a generous grant from Governor Jerry Brown. Is that support or oppose a political candidate? Unlikely. Yeah. So take a more generous governor. Pick one of your choice. Is that — does that violate the statute? I think it probably does. Why? Because it's promoting or opposing a candidate. Because a candidate is — a candidate is not — It says any ad which is intended to support or oppose. Right. Now, is anybody — I don't see the word promote in the statute. Well, a support or oppose is a political candidate going to put — spend advertising dollars, his campaign funds, on an underwriting announcement which is not supporting his candidacy. I don't think so. That's his choice. Well, it's — He wants to spend his money. If you put your name — a typical billboard — don't go back to billboard law because that's what I know best. One of the things about billboards is — I want to go to billboard law when we're in the broadcast arena. Because in billboards, lots of times people promote their candidacy because billboards are a unique medium where you have to just glance at it and that's the end of it. You can't sit down and read it because you're driving at 55 miles an hour. A lot of political ads just have the name of the candidate. That's all they have. But we know with regard to commercial ads that it's okay to put the logo of the person, and that that is not considered promoting any service facility or product. So why would putting a picture of a candidate be supporting or opposing a candidate? Promoting a — you can promote the company, but you can't promote its products or services. Well, I don't know. When you say they make great furniture and you're putting the logo of a furniture company, it sounds to me like you're promoting the product. This is your example. You came up with it. If they had just said this was brought to you by hardwood artisans, it wouldn't have been a problem. Nobody would have a problem that that violated the statute, okay? Well, maybe it violates the statute. I'm sorry, pardon me? I said maybe it violates the statute. I mean, maybe the FCC has got it wrong on interpreting the statute, but that doesn't make the statute unconstitutional. Yeah, you're making a facial challenge. You're saying that this can't be done without violating the Constitution. I think there's a separate — you might have a separate challenge if the FCC regulations overburden you, but let's get back to your facial challenge. What's wrong with the statute facially? What's wrong with the statute facially is that it permits commercial speech while prohibiting categories of noncommercial speech. Well, but it doesn't even do that, because if you want to — it only does it if you're paying for it, if it's — if you are being paid for it, right? That's correct. So if you want to put that same picture on, if you're not being paid for it, that's fine. So you don't have a First Member problem, because you can do whatever you want. Well, except that under Pittsburgh Press, the Supreme Court recognized the right, generally speaking, of the news medium or any medium of mass communication to accept or reject advertising. Okay. That was an issue in Pittsburgh Press. And they said, yeah, generally speaking, you have the right, but in this case, you don't because the person is proposing what amounts to an illegal transaction. But by the by, they acknowledged that. And they said, well, generally speaking, you know, that case is near and dear to me because I used to be a general counsel in the newspaper. Four minutes. I'd like to reserve, if I might. Thank you. Okay. We'll now hear from somebody on the appellee side. Are you Mr. Stern? Yes, Your Honor. That would be me, Mark Stern, for the government. Two points, I think, came through from discussion with my brother counsel, which are, one, this is a facial challenge to a statute. And two, the scheme would be valid in counsel's view, but for the fact that Congress did not specifically bar certain kinds of ads. So that the that's all that we have before us is the question is, is that a basis for facially invalidating the statute? And we think on It can be, right? If they say, if the statute says you can accept Republican ads, no Democrat ads, bam, that would be unconstitutional. That's right. We're not saying that So you can. There's nothing theoretically That could be a There's nothing theoretically impossible about a facial challenge Absolutely not. But this facial challenge Before you get to the substance of it, can you just spend a couple of minutes talking about the standard by which we judge this? Is it strict scrutiny? Is it intermediate scrutiny? Is it rational basis scrutiny? Well, we think it's certainly not strict scrutiny. Why not? Well, it's certainly it's not a viewpoint-based discrimination It sure is. I'm just constrained to I mean, isn't it making distinctions between subjects? You know, certain subjects It's making a distinction Certain subjects are prohibited Well, I think that's what makes it content-based is the panel, all members of the panel, I think, correctly recognized that it was content-based. We haven't argued otherwise. What we do think, however, is that the Well, how exactly is it content-based? It seems to be saying, essentially, that whether you're a candidate or a person selling something or a person selling your views, you can't Let's leave two out of it for now because I don't know if that's even the case exactly But one in three They seem to be parallel I mean, in that each of them is saying they're addressing different kinds of ads But they're basically saying the same thing about them, which is you can't You can mention these things, but you can't promote them Yes, I think that's right So what's content-based here? Why isn't it treating political candidates and products the same rather than differently? I don't want to argue against myself, but I think that the argument in favor of the notion that it's content-based is that you have to look to see what the content of the speech is Why? If it's saying whether you're a candidate or you're selling an ad, the same thing applies You can't be promotional, but you can say that you're supporting something I think, Your Honor, I'm happy to accept the view that that's not content-based We've looked at it as being that you look to the content On the other hand, we also think that this comes within the context of the relaxed scrutiny that's appropriate for this kind of spectrum, scarcity, limited where you have here Let's just go back one second This is Red Lion, right? It is Red Lion Why hasn't Red Lion been overtaken by events? Well, if the Supreme Court decides that it has, it will be But in the meantime, and I think Do we have to wait for the Supreme Court? I mean, when they issue an opinion about buggy whips at a time when people drove buggies, we might look at the case now and say, well, you know, it doesn't really apply And if it's a rationale decided, what was Red Lion was 67, 68? When the only way to reach a mass audience was by broadcast spectrum We might say, well, you know, that just rationale just doesn't apply anymore because hardly anybody views things through the airways anymore It's a small part of the whole market You've got your cable, you've got your satellite, you've got your internet It's about 13% actually, which is It's different from 100%, right? Certainly different from 100% It was 100% when Red Lion was decided, right? It's probably close to it, yeah So why isn't Red Lion a dead letter? We should just sort of say the Supreme Court just hasn't gotten around to overturning it, but we know it will I think that the court, like in Agostini v. Felton, cautioned the courts of appeals to wait for it to overrule a doctrine And the courts of appeals have continued to apply Red Lion both in the original sort of over-the-air and also in the satellite context where we also have spectrum scarcity And go back, this comes up again Go back to 1952 This is, in essence, a structure that has been in place since the very inception of an idea of public educational radio or subsequently television We go back to the 19-, originally even in the 30s where you start having set-asides of licenses for educational television for educational radio originally and now subsequently educational television These licenses, the people who get these, these are set-aside They're free You don't engage in competitive bidding There are a lot of advantages to coming in and getting one of these set-aside licenses But they are far less valuable today than they were in 1952 in the sense that if you didn't get a license like this in 1952 there was just no way you could reach a mass market You might be able to publish a newspaper which would reach some people But if you wanted to get into people's homes you wanted to get into people's cars you wanted to get into direct contact with the audience on a mass basis That was it The spectrum was it There was nothing else The world is very different today This is a slightly different point I think that I'm trying to make than the spectrum scarcity point which is that it is true that there are many ways more ways in which the programming gets distributed But on the license point if you want to get into the game to start out with regardless of how your program is ultimately going to get carried you've got to get the license I'm sorry, I'm not sure I understand what you mean If you want to say I'm going to do a show and just do it on YouTube No, absolutely You need a license from the FCC And you can reach millions and millions of people much more than any radio station did in 1952 today from your desktop at home getting a law license from anybody That possibility did not exist in 1952 or 1967 when Red Lion was decided Why isn't all that ancient history now? Why should we treat this whatever the Supreme Court said there as having any validity today in a world where this is such a small part of the market and there are so many more ways Remember, we're talking about the First Amendment We're talking about an exception to one of the fundamental rights that were granted by the Bill of Rights and that is this right to speak And the Supreme Court says well, there's an exception because this is such a unique and limited opportunity for people to reach It already exists You've got YouTube We live in the world of YouTube Your Honor I think that aside from the fact that there are whole new alternatives other than television and radio I think that the crucial point for this case is we're not talking about a general regulation of all radio stations or television stations which is what Red Lion in most cases are fundamentally addressed to And one could even question the validity of Red Lion in other contexts But here what we have is a what we have is in the general world in which you can do all the advertising of any kind that you want to there is a small spectrum of television and radio and that's the universe we're talking about It's the only universe There's a small spectrum in which Congress has said let us try to develop based on a different economic model a wholly different kind of programming That's been the case for 60 years The argument here is that because 30 some years ago Congress when it codified a slight relaxation of that principle didn't specifically address ads for persons that are where the promotion is not for profit that the entire scheme should come crashing down Well I Mr. Stern I would like since you're getting into that area I wanted to ask you something about the record that we have in this case In the League of Women Voters the Supreme Court requires that a restriction on speech must be substantially advanced the government's must advance the government's substantial interest and in this case how do the restrictions on political and public issue ads advance the government's interest in this case and the record the case against commercial ads is addressed in the record but what in the record concerning political and public issues are where is that in the record and should this be remanded to the district court to take a further evidence on restrictions on political and public issue ads No I think that I think that there is an error in the panel's reasoning when it says that there is no discussion of sort of commercial ads and the error I think is that all the discussion in Congress by everybody when they're talking about the commercialization they don't they're not distinguishing between some ads for you know for you know a laundry detergent what they mean is getting paid for exactly that's what they're talking about it's absolutely clear when you go through the record that at every point that's what people are talking about and the history makes clear that they're talking about money for political At least Congress saw this as economic regulation not a speech regulation Absolutely it is purely it is economic regulation it's part of But it's economic regulation that affects speech Of course in the sense that the whole premise is if you dump a bunch of money in there go you change the outcome in terms of your programming and the only way presumably to have some semi-pristine programming is to basically draw the line so it's economic it's speech regulation in the form of economic regulation Exactly that's exactly right But couldn't you say though that speaking of the political speech and the public issue speech are core First Amendment rights which are different than commercial speech Do we have to read the record the way that you're saying it? I think so  because it is so clear throughout If it were so clear we probably wouldn't be here No, no I don't think that's right Your Honor because there's no discussion all the testimony doesn't distinguish between the different kinds of ads for sale and the reason that there's virtually no discussion of non-profits is that there has never been any significant amount of non-profit advertising anywhere so this is sort of a red herring Can I ask you a question about the record? This troubles me in this case. Could Congress have passed this statute without a record at all? I think that particularly in this case given what Congress was doing was acting on the basis of 30 some years of SEC regulation Is Congress required to adhere what we have is this legislation is preceded by a very extensive FCC rulemaking proceeding and Congress essentially comes in and says okay I think you went a little too far in what you did here it says you and it says I'm not going to let you go quite as far as you did but imposes restrictions but modifies what the FCC did. So this is Congress acting in response in part to an extensive rulemaking. So if instead of the FCC a citizen had come to Senator so-and-so and said here's a great idea for changing the statute it used to be wholly inclusive and now we want to be a little bit looser and the Senator said that's a great idea and sold it to all of his colleagues and the House adopted it, would there be a constitutional deficiency in that process? No, there certainly wouldn't be a deficiency in the statute if Congress was sufficiently clear that you can that Congress can be understood to have understood them. Would you do what Turner did? I don't think you need to bite off all of that. Turner makes it pretty clear that we need to look somehow to what Congress has   what Congress has done and what Congress had in its head and that there is some substantial support for what it did. Now, I don't think that that has to be read only to the 81 hearings. Clearly, Congress is legislating against a backdrop, against a long bunch of experience, but I don't think the answer out of Turner is that a Congressman can sneak something in as a writer to a defense appropriations bill that limits free speech and that's sufficient record. But that's not the case we've got to follow. So don't argue that Congress has   evidence and that Congress has a record evidence. And also, look, usually when we're talking about upholding Congress ---- What is it? I was trying to find what was record evidence and I wasn't ---- I mean, there's some stuff in there.  there's some evidence there. Would you go back I think the one ---- Well, how about answering my question first? Oh, I'm sorry. I thought you did. No, I don't think you did. That would have been good. So tell us what there was for Congress supporting Congress's decision. Okay. What we have is the we've got and, you know, I don't want to belabor it, but we've got 30 years of the FCC regulating the availability and the possibility of doing advertising at the time that Congress acts. We have extensive That's so vague. What does that mean? Well, what it means is that the FCC had specifically recognized from the outset and it repeated and it studied this when these issues kept coming up and what it repeatedly recognized was that it was antithetical to the creation of a wholly different kind of programming which would feature programming that relatively in some cases Let me be specific because you're going on stuff that doesn't matter. What is it that supports the distinction of Congress? For a long time there was prohibition and nobody is arguing that a total prohibition would be a constitutional. Nobody here has argued that. So you don't have to go on and on telling us that a prohibition is constitutional. The question is specifically what was the support of the distinction drawn by Congress when it said if you have issue ads, political ads and commercial ads can't be, you can't have advertisers for that, but you can have it for nonprofit groups and donor acknowledgments. What evidence is there supporting that distinction? Well, if the distinction is for the nonprofit groups, there is no there is nothing, but there are a couple  I'm sorry, when you say nothing, there's no evidence at all. There is not any evidence about nonprofit groups. Let's understand that this is, what we have here is to the extent that Congress did anything, it didn't specifically legislate with regard to them. If the court thought it was a problem, the court could read this to say that the FCC would not be allowed to accept non, to allow anybody to advertise because the statute doesn't say that the FCC can't authorize it. The FCC concluded in the wake of I'm sorry, you're saying we can just roll it back? Yeah, but Your Honor suggests it could be a common I'm not saying you should, I don't think that there's any reason to do it doctrinally. I'm just saying, Your Honor's suggestion of I'm sorry, I asked you what supports the distinction and you said nothing, but you could just treat it as if the distinction didn't exist, which sounds to me like what you're saying is there's nothing to support the distinction and therefore you should roll it back and say there's no advertising at all. Why don't you give me another solution? Why don't you  solution, I'll be upholding the distinction on the attorney. Your Honor, the distinction here is Unless the government wants to say, no, we don't support the distinction. Your Honor, I think we've tried very hard and perhaps failed to   I  we've tried very hard and perhaps failed to do that. Your Honor, I think we've tried very hard and perhaps failed to do that. Your Honor, I think we've tried very hard and failed to do  Your Honor, I think we've tried very hard and failed to do that. I'm sorry, that's okay? I'm sorry, that's permissible under the statute, right? If I understood the question correctly, yes. Okay, so what is there in the record, in the congressional record before Congress, saying ads for cars or hamburgers are corrupting and will destroy public television, whereas ads for these companies will not do that? I mean, there may be some non-profits like the ACLU ad or the Heritage ad. What is there to say that the distinction is a valid one? Your  I mean, the record does what the representatives of GBH sort of explain are, one, that to the extent that, A, there are very few. Two, to the extent that they exist, non-profits tend to be positioning themselves in much the same way as sort of like the underwriting aspects. I'm sorry, this isn't in the congressional record? No, I think that's in the declaration. Why don't you go to the district court record? I don't mean to stop. I realize there's stuff in the district court record, but I specifically want to focus on what's before Congress, because Turner said that if you say there's nothing before Congress, we need to move on to the district court record. And I think that's very important. But I just want to make clear that what Congress was doing was indeed acting against the declining federal support for public television and broadcasting. It was looking to loosen regulations in a way that would  alternative revenue sources without undermining And it decided commercial is bad, noncommercial is good. And the question is, is there any evidence before Congress to support that notion? It's not really what Congress did. That I would resist. That is not what it did, what it didn't do. And it's what we normally the only way that the failure to specifically address advertisements for certain groups for promoting services could be thought to present the First Amendment. I have raised this question about whether the statute actually makes that clear.      It's not made clear. And I think it's not clear by any person who is engaged in such offering, that is, as to that product, for profit. So if somebody is selling tickets to an opera, does that not count as selling them for profit, even though in the end it's a 501c3? Your Honor, I don't think the FCC has interpreted it that way. Why isn't that what it says? It doesn't say anything about profit. I think it probably interprets it that way because of the IRS code. Judge Newman has a question. I take it you agree that political speech is on the highest rung of the ladder. It's the highest value that preserves our democracy. Now, tell me, I have not got it out of you, why is it permissible to ban political speech and yet permit a variety of commercial speech? Because what we're talking about are all commercial speeches. These are all nobody's done Excuse me.  is advocating the election of someone. Yes, Your Honor, but just to be clear, nobody is restricting the ability of any station to air political speech or debate. What the scheme does is to say that there are not going to be ads promoting candidates and it's done not in, remember, this is the context of this discrete, narrow, publicly supported area in which Congress has bent over backwards for 60 years. But why does it become less political if it's unbroadcast? I just don't get it. Because it's not the entire  It's a segment in which the reasons for this are What's the reason for suppressing political speech? The reason is that this is the same, even though the panel decision that there were entirely different considerations Well, what is the reason? Tell me the reason. Because we don't know   know the reason. And we couldn't know whether he did. Nobody knows what would be spent in this area. There's $3 billion that were spent on political advertising on radio and television in the 19 19, there's where I am, in the 2012 election season. Is that part of our permissible record? Well, it's certainly a matter that's subject to public notice. But it's not really even part of the district court record, right? We're just sort of talking about it. No, but the $2.2 billion figure was part of the district court record. And the district court record doesn't explain what, in your view, effect that has in terms of upholding the statute after the fact in terms of congressional rationale. Your Honor, the Turner, which explicitly says, if there was not an if it wasn't clear what the basis was for taking an action was before Congress, that the appropriate course would be, as it did in that case, to remand to the district court for proceedings. And Professor Knoll, who presented a declaration here, is one of the same people who appeared and provided evidence in Turner. This is the way it's the district court. We said to the district court, you can rule without taking additional evidence. The district court said, I want to hear additional evidence. We provided a lot of evidence. It all goes to the same point. This is we are talking about the district    do this, the statute would be unprecedented. And again, also with regard to  judgments, usually when you're looking at predictive judgments, you don't know how it's going to turn out. It would be a problem. If you told the district court that you didn't need the additional evidence, what evidence were you relying upon to support the statute at that point? We were looking at the fact that there was an extensive regulatory record, plus there were witnesses before Congress from public radio and public broadcasting who all made the same points. And we here when we Can I ask one question before you finish on a slightly different point? This is a very unusual station in that it gets no public money. Almost all the other ones do. Does that make any difference, i.e. Well, what I'm wondering is this. If this If there was public money, as there would be in a Is this case a one-off, in other words? Because if we The justifications for having these restrictions may differ if there is a chunk of public money in there. No, Your Honor, I don't think that that there's still this station acquired its license. It has a major advantage I understand that, but I'm saying that you would have a set of other arguments, would you not? If there were public money involved. There would be even more. But this is endangering the entire structure because what happens is this comes up because competing public stations said, look, these guys who enjoy all the advantages of an educational television license are airing the kinds of ads we want to run. I understand that. But that's very important. They're operating on a playing field that's designed for people who do not go in to compete. But for people who are being subsidized by the Federal Government, giving the Federal Government a lot more room. Well, these people are being subsidized too. That's what you get when you get a free license. That's a very serious thing, and you get there's enormous tax subsidies. The subsidy that gets indirectly to all of these people is a benefit that accrues to them as the direct subsidies from CPD. Is there a separate set of regulations that come from the funding that lead to the same place? Does the Corporation for Public Broadcasting and the statutes that regulate that provide similarly or wrap in the set of regulations as a condition of receiving Federal money, not as a condition of receiving the station? No. CPD has guidelines that it issues itself for its participants, but they are not Congress. The only requirements, as far as I'm aware, in the whole public area are this, that if you're going to get the license, you do it, you promote a noncommercial is the word that appears in the statute. And that's not what I'm asking. I'm asking the opposite question. To get CPD money, do you need to  of these licenses? Yes. Yes. I mean, they all need to have the licenses. Thank you. Thank you very much, Your Honor. I appreciate the time. You have the better part of four minutes. We'll generously round it up to four minutes. I'm going to bounce around here so I apologize in advance. First of all, Mr. Stern said that we're only complaining about the inversion, the commercial versus noncommercial distinction. We have not abandoned any of the arguments we've made below. That just happened to be the one we wound up spending a lot of time on. So, you know, we're clinging to every argument we made below. With regard to the Supreme Court's case, the Supreme Court said no, we're treating it all the same, strict scrutiny. Also, if you look at the Brown case, the violent video games case, which originated here, again, the Supreme Court lumped   Court case in with all the things that were entitled to strict scrutiny. So I think you have a lot of support for that, but I don't want to waste too much of my time on that. To what extent is the point that you're getting a free license and, therefore, a subsidy for the     station? I mean, all broadcasting stations, all private stations, all commercial stations originally got their license for free, too. Nobody paid for them. So you can say the same argument can be used with regard to any broadcast station. And the thing is, if you go back to legal union voters Excuse me. Yes. The license you have, however, has particular conditions and you couldn't have gotten it without meeting those conditions. Every license he has has particular conditions. Yes, but you would have been competing in a much broader realm if you had not promised to meet those conditions. Having competed for broadcast licenses, I'm not sure that's correct. There's tremendous competition for every broadcast license, whether it's commercial or noncommercial. That's not the point, though. If there's commercial, there's noncommercial. Once you decide to go one route or the other, you accept those conditions, correct? Well, except that you can't accept an unconstitutional condition which is imposed upon you later. Legal union voters, that case involved only stations that were getting public money from the Federal Government. But you agreed to be a noncommercial station,     noncommercial station, and you agreed to have content-based unconstitutional restrictions. So really, for your client's sake, you'd like to go back to zero where there's not even any possibility of any sponsorships or additional money coming in as revenue to the company, correct? Well, they would prefer not to have that result. They would prefer you to strike the restrictions. But, you know, they're not the ones making the decisions. Let me ask you this if I may, and I think the answer can be quick. Are we permitted in terms of what we can consult for support for the congressional budget, are we permitted to look at the Osier and Noel affidavits presented to the district court? I think it's a two-step process. In our response to the petition for rehearing, we laid this out in great detail. Is the answer yes or no? No. It's a two-step process. And           Osier and Noel affidavits presented to the district court. It's a two-step process. But can we look at them? Only after you determine that there is substantial evidence in the record before Congress. You can look to it then. Is this based on Turner or are you claiming that there is a general rule for any First Amendment challenge to any state or local or federal statute that you can only rely on records before the legislative body, whether it's a city or a     state   federal statute? It's a two-step process. It's not a one-stop case. There either is a general rule that applies to First Amendment cases in general or there isn't one. Is there a general rule? I think the Turner applies generally. And if you look at the Can you think of any other instance in which it's going to apply? Yes. In our brief, in our response to the petition for rehearing, we discussed the decisions    Court. The Supreme Court has made decisions from four circuits. The one that's the most complete, which really gives you an absolute road map, is from the fourth circuit. Is there any example? None that come to mind. It's all on the broadcast area. But Turner was not this kind of a broadcast case because it wasn't based on the scarcity rule. It was on a completely different premise. Okay. But the thing is the framework has been applied. Okay. I think if you look at the other cases, including the FCC's brief and the case we cited from the DCC circuit, they admit that there has to be substantial evidence in the record before Congress. Well, they may admit it, but I'd like to know where this rule is coming from. I think it comes from Turner I and Turner II. Which isn't this kind of a case. Well, it's actually that was a content-neutral case, and we're talking about a content-based case. But it wasn't about it was a case in which it was precisely not about broadcast stations. It was about non-broadcast stations. Actually, Turner II has been applied recently in a case in which the case was decided on March 4th, which makes reference to Turner. Oh, good. We can overrule it. No. Seriously. I'm just saying it. I'm going to come up with another context. My first reaction was, gee, I don't remember the Turner case being cited anywhere else. I don't remember the details, but I know that the Turner cases were cited in that case. Thank you. The case is on your stand submitted. We're adjourned. Thank you for your indulgence. Thank you. The court is adjourned.   Thank you.
judges: Kozinski, Noonan, Silverman, McKeown, Wardlaw, Fletcher, Gould, Berzon, Rawlinson, Callahan, Hurwitz